Auburn P. SMITH *v.* Tommy GOODSON

75-122                                                528 S.W. 2d 397

Opinion delivered October 20, 1975

*Brown, Carpenter & Prewett*, for appellant.

*Harry F. Barnes*, for appellee.

J. FRED JONES, Justice. This is an appeal by Auburn P. Smith from an adverse decree of the Ouachita County Chancery Court in a property line dispute between Smith and the appellee Tommy Goodson.

In 1923 the appellant Smith's father purchased from a Mr. Anderson a tract of land in Ouachita County described as the NE¼ of the NW¼, Section 26, Township 15 South, Range 17 West, containing 40 acres more or less, together with a small tract described by metes and bounds in Section 23. The appellant Smith acquired title to the property under the will of his father when his mother's life estate was terminated by her death in 1970.

In May, 1950, the appellee Tommy Goodson acquired title to the SE¼ of the NW¼ and the NE¼ of the SW¼ of Section 26, Township 15 South, Range 17 West, containing 80 acres more or less by warranty deed from a Mr. and Mrs. Wright. The appellee's land lies immediately south of the appellant's land, with the north boundary line of the appellee's north 40 acres, more or less, forming the south boundary line of appellant Smith's land and the common division line between the two tracts.

In the summer of 1972 the appellee sold timber on his land and a dispute arose between the parties as to the exact location of the boundary line separating their respective tracts. The appellant Smith filed suit against the appellee Goodson alleging that Goodson had destroyed a fence marking the division line separating their property; that he had erected a new fence 80 feet north of the original fence and true division line, and had cut timber from the 80 foot strip which belonged to Smith. Mr. Smith, in effect, prayed confirmation of his title to the 80 foot strip; for an injunction against the appellee Goodson from entering thereon and for damages in the cutting and removal of timber therefrom. Mr. Smith alleged that he and his predecessors in title had exercised uninterrupted possession of the strip of land involved for many years, and that he and the defendant and their respective predecessors in title had at all times prior to 1972 acquiesced in the fence which appellee removed as marking the true and proper division line.

Mr. Goodson filed answer denying the allegations of Mr. Smith and claimed title to the land involved under his deed and also alleged continuous, open and uninterrupted possession thereof.

The chancellor made findings in a written opinion reciting the respective ownership of the tracts as above described and found the testimony offered by the parties to be in irreconcilable conflict. The chancellor then found as follows:

"The government plat which is on file in the County Clerk's Office was introduced in evidence discloses that each of the two tracts in question are regular in size and shape and each contains forty acres. Plaintiff's Deed conveyed to him forty acres. The quarter section line between the two forty acre tracts is a straight line East and West across the entire section.

In 1965 Plaintiff secured the services of F. M. Methvin, the County Surveyor of Union County, Arkansas, and who is a reputable Engineer and Surveyor, who surveyed Plaintiff's tract and a copy of the plat made by him from the survey was introduced in evidence. It showed the line between the parties to be at the place shown on the official plat and stated that Iron Pins were in or placed at each corner of Plaintiff's tract.

On March 23, 1974, Plaintiff secured the services of Mr. Ed C. Turner, a reputable and qualified surveyor, who surveyed the line between the parties and a copy of his plat of the survey was also filed in evidence and it too reflects the line between the parties to be the same as the Government Plat.

There can be no question that the official Plat and the surveys made by two able and competent surveyors are identical, (except Mr. Turner also shows on his plat a line as claimed by Plaintiff) and that the official survey is the true line between the parties. This brings us to the claim of Plaintiff of title by adverse possession and the Court finds that the evidence falls far short of establishing this contention."

The chancellor then entered a decree reciting in part as follows:

"That Plaintiff is the owner in fee simple absolute of the Northeast Quarter of Northwest Quarter (NE¼ NW¼) of Section 26, Township 15 South, Range 17 West, Ouachita County, Arkansas; that Defendant is the owner in fee simple absolute of the Southeast Quarter of Northwest Quarter (SE¼ NW¼) of Section 26, Township 15 South, Range 17 West, Ouachita County, Arkansas; that the Government plat which is on file in the County Clerk's office discloses that each of the two tracts in question are regular in shape and each contains 40 acres; that Plaintiff secured the services of F. M. Methvin in 1965, who surveyed Plaintiff's tract and that the plat made from the survey, which was introduced in evidence, showed the line between the parties to be at the place shown on the official plat, and stated that iron pins were in or placed at each corner of Plaintiff's tract; that Plaintiff secured the services of Ed C. Turner, who surveyed the line between the parties, and a copy of his plat of the survey was also filed in evidence, and it, too, reflects the line between the parties to be the same as the Government plat; that there can be no question but that the official plat and the surveys made by two able and competent surveyors are identical (except Mr. Turner also shows on his plat a line as claimed by Plaintiff), and that the official survey is the true line between the parties, that the evidence falls far short of establishing the claim of Plaintiff of title by adverse possession; that the Complaint filed herein by Plaintiff should be dismissed with prejudice; that Defendant should be awarded his costs herein, and that Plaintiff should have thirty (30) days from the filing of this Decree with the Circuit Clerk of Ouachita County in which to file an appeal to the Supreme Court of Arkansas.

IT IS, THEREFORE, CONSIDERED, ORDERED AND DECREED that the Complaint filed herein by the Plaintiff should be, and hereby is, dismissed with prejudice; that the Defendant be, and hereby is, awarded his costs herein, and that Plaintiff be, and hereby is, granted thirty (30) days from the filing of this Decree with the Circuit Clerk of Ouachita County in which to file an appeal to the Supreme Court of Arkansas."

The appellant relies on the following points for reversal:

"There is no substantial evidence to support the court's finding that the government plat discloses that each of the two tracts is regular in shape and contains 40 acres and that the government survey and the surveys of F. M. Methvin and Ed C. Turner all disclose that the official survey is the true line between the parties.

The court erred in failing to find that the 'Old Goodson' fence established the boundary line between the two tracts, as set forth on Mr. Ed C. Turner's survey, by virtue of acquiescence.

In the event there was insufficient evidence to establish the boundary line at the 'Old Goodson' fence by virtue of acquiescence, the court erred in failing to divide the overage equally between the two properties."

Our difficulty in this case on trial de novo does not arise so much from the irreconcilable conflict in the *testimony* as it does from the irreconcilable conflict in the *evidence* as a whole. Mr. Methvin, who made the survey for Mr. Smith in 1965, did not testify, but the plat of his survey was submitted in evidence as defendant's exhibit No. 2. This plat shows the length of the south boundary line of the Smith tract to be 1,-329.4 feet, and the length of the east and west boundary lines to be 1,320 feet each. The length of the north boundary line is not indicated on the plat. According to the evidence, this survey was made in connection with a question pertaining to the location of the north boundary line of the Smith tract in connection with property lying in Section 23, which was unrelated to the litigation involved here.

The original government survey plat superimposed on plaintiff's exhibit No. 1 contains no designation at all as to the length or width of Section 26, but does show the east side of the entire tier of sections running east and west across the township as being 5,280 feet. Whereas the west boundary line of the south one-half of Section 30 on the west end of the tier of six sections is shown to be 2,640 feet, and the west boundary line of the north one-half of Section 30 is shown to be 2,-

767.38 feet, making a total cɟ 5,407.38 feet for the west boundary line of Section 30.

Thus, it is obvious from the government survey plat that the west boundary line of the north one-half of Section 26 would be at least some distance longer than the east boundary line of the north one-half of Section 26, and it would only follow that the west boundary line of the appellant's property would be some distance longer than the east boundary line, unless the discrepancy should be adjusted by some engineering or surveying process, or from monuments not designated on the government survey plat.

The plaintiff's exhibit No. 2 appears to be a larger photograph of part of the government survey plat showing the entire township from Section 1 through Section 36 north and south, with the exception of the two westerly tiers of sections on the west side of the township. This plat shows Section 26 and all other sections designated on the plat as containing 640 acres. The north and south boundary lines of these sections all differ in length. The south boundary line of Section 26 is shown as 78.18 chains, which would be 5,159.88 feet, and the north boundary line of this section as 78.14 chains, which would be 5,157.24 feet.

Mr. Ed C. Turner was employed by the appellant Smith to make a survey of the property here involved and he prepared a plat of his survey together with an enlarged copy of the original government survey, above referred to, under date of March 23, 1974. Mr. Turner's plat was offered in evidence as plaintiff's exhibit No. 1. His plat included a reproduction of the original government survey, or plaintiff's exhibit No. 1 above referred to. Mr. Turner's plat as to the specific property here involved, however, shows the west line of the Smith tract or the NE ¼ of the NW ¼ of Section 26 as being 1,320 feet. The west line of the appellee's tract, the SE ¼ of the NW ¼ of Section 26, as being 1,482.6 feet, and the west line of the appellee's south 40, the NE ¼ of the SW ¼ of Section 26, as being 1,333 feet. Mr. Turner's plat does not designate the length of any of the other boundary lines of the property here involved, but does indicate the area in dispute as included in the SE ¼ of the NW ¼ of Section 26 and as be-

ing 72.5 feet in width on the east end between the old fence referred to in the testimony and the boundary line between the Smith and Goodson properties as indicated on the plat of the Methvin survey and as indicated by the straight lines on the government survey plat. Mr. Turner's plat shows the center of the disputed strip across the north end of the SE ¼ of the NW ¼ to be 53.5 feet in width and 61 feet in width on the west end.

We touch lightly on the conflicting lay testimony pertaining to the fence here involved as related to the survey and government plat lines. Mr. Smith admitted that he had his land surveyed by Methvin in 1965 in connection with another transaction not involved in this case, and that Methvin did place corner markers as indicated in Methvin's plat. He said, however, that he never did accept Methvin's survey as establishing his true south boundary line. He said he had always considered the old fence, which was some 61 feet south of the Methvin survey line, as the true boundary line between his and the Goodson property, and that Goodson had also accepted and acquiesced in the fence as being on the true boundary line until he started cutting timber from the area in 1972.

This testimony was denied by Goodson. Goodson and his witnesses testified that the true boundary line and corners, as established by Methvin, were the true boundary line and corners; that they had always been so considered by Goodson and his predecessors in title; that Goodson purchased the wire and permitted the fence to be erected (two strands of barbed wire) through the woods across the north end of his property for his own use and to accommodate his friends as a pasture for their horses while deer hunting on his property. Mr. Goodson said he purchased the wire and permitted some of his friends to erect a fence and that he simply required them to erect it well within his north boundary line and avoid getting on anyone else's property.

Mr. Smith said he assumed that Mr. Goodson had erected the old fence and that he or his brother pointed out to Goodson where the property line was at the time the fence was erected.

We now consider the testimony as it relates to the plats in evidence. Mr. Ed C. Turner, called as a witness by the appellant Smith, testified that at the request of Mr. Smith he made a survey of the property here involved on March 25, 1974. He testified that he started his survey at an established point on the south line of Section 35 and ran north to Section 26. He said he found Section 35 to be 5,382.8 feet in length, or to contain an excess in feet of 102 feet. He said he found the SW corner of the SE ¼ of the SW ¼ of Section 26 located in a road at the corner of the section. The pertinent portions of Mr. Turner's testimony as copied from the record are as follows:

"Q. To summarize it, you surveyed Section 35 and you established the corner of Section 26 and found a corner located in a road?

A. That is true.

Q. Did you make reference to the original government survey?

A. Yes sir, I did.

Q. For what purpose, Mr. Turner?

A. Each time I conduct a survey, platted outside of the city limits, each surveyor refers to the original government survey according to the original layout. This plat is on file in the County Clerk's Office to determine whether a Section is exactly a Section, or larger or smaller. It is indicated on the plat as to the original survey of this County, or State of Arkansas, as to how they are located or platted. The original is located in the Clerk's Office in each County.

Q. Did you bring that book with you?

A. Yes.

Q. Would you turn to the page with regard to Section 26?

A. Yes sir. That will be Section 26, Township 15 South, Range 17 West, page 14.

Q. Did you put on your survey part of the original government survey?

A. Yes I did, except I converted the chains to feet. The original government survey was in chains.

Q. The government survey was in chains but you converted it on your survey in feet, is that correct?

A. Yes sir.

Q. What did the original government survey reflect?

A. It shows that it is an even measured Section on the east side but when they came west, it was either over or under. The north half had 1.93 chains over a half mile.

Q. How long is a true half mile in terms of feet?

A. 2640 feet.

Q. What does the original government survey show as to overage, translated from chains to feet?

A. Your south half is an even 2640 feet, according to the government survey.

Q. You are saying the south half is a true half mile then?

A. It is supposed to be.

Q. What does it reflect on the north half?

A. The north half is supposed to be 2767.38 feet, or a plus of 127.38 feet, which is longer than the true half mile.

Q. So the original government survey reflects that the north half of Section 26 is 2767.38 feet, which is longer?

A. Yes. Before I conduct a survey for anyone, I go to the original government survey to determine whether it is large or small, and if it is short I have to convert proportionately each 40 acre tract. If it is standard, then I refer to this to determine my survey.

Q. If this is true and the original government survey shows the north half of Section 26 has an overage, what does that cause you to do when you prepare your own survey?

A. If all the overage is determined to be in the north half of that Section, then it is divided proportionately.

Q. You said the original government survey shows an overage of 127.38 feet. What does your survey show as to any overage?

A. My own survey shows we had a 135.22 foot overage in the north half only.

Q. What rules of surveying are applied when there exists an overage in a half?

A. It is divided proportionately.

*  *  *

A. If it is specified in one 40 acre tract, it is so specified. If it is specified in the whole Section, it is so specified. It is a survey rule I go by from the original government survey.

Q. In this case, was the overage attributed to the north half only?

A. There was overage in the south half also, by occupation.

Q. Was that shown in the government survey?

A. No sir. It was indicated in the north half only by the

original government survey.

Q. So if there is an overage in Section 26, it would apply to the north half?

A. That is true.

Q. Your survey reflects a broken line which is designated an old fence. Did you survey the old fence, Mr. Turner?

A. Yes.

Q. Who was present to assist you in your survey?

A. You were there and Mr. Auburn Smith and two of his brothers. Approximately five or six people were with me.

Q. How did you locate the old fence?

A. It had been there a long time and I found wire embedded in the trees. I found at least one tree every two hundred feet and I measured every two hundred feet across to determine this fence line.

Q. You established the old fence by finding barbed wire on old trees from east to west, is that correct?

A. Yes sir.

Q. At the extreme west side of the property you located the fence 61 feet south of the painted red and yellow line, is that true?

A. That is true.

Q. And in the middle you located it 53.5 feet?

A. Yes sir.

Q. And at the extreme east side of the property, you

found it to be 72.5 feet of the painted red and yellow line?

A. Yes sir.

Q. Do you have any rules which you apply to a fence which is not straight across property at the parallel line? It does vary here?

A. I don't have any rule, but I have to run a straight line and whatever the difference is I have to so note.

Q. How do you reconcile the difference?

A. I would determine the average width of the entire length of the fence and divide it and come up with a common denominator."

On cross-examination the pertinent portion of Mr. Turner's testimony appears as follows:

"Q. When was the original government survey made?

A. I don't believe it has a date on it. Somewhere in the 1800's I would say.

Q. And you are testifying from that survey?

A. Yes.

Q. Does it show corners on there?

A. Yes.

Q. Does it show fences?

A. No.

Q. Does it show roads?

A. Yes.

Q. If there were no conflict between the parties here, we could get this government survey and take you out there and then you could lay off the various lines and you could testify what you just testified to, isn't that right?

A. Yes sir.

*   *   *

Q. You have apportioned the overage and underage to your survey, is that correct?

A. Yes.

Q. But not with any reference to the occupation line?

A. Yes, existing corners.

Q. The existing corner in the NE¼ of the SW¼ of Section 26?

A. Yes.

Q. What marks that corner, Mr. Turner?

A. Iron pin in the ground and a witness tree.

Q. Do you know how long they have been there?

A. No. I can usually tell from embedded wire in trees about how long it has been there.

Q. On the other end there is a pine tree there also, 61 feet north of the existing fence, is there not?

A. Yes.

Q. Did you follow this line across the north half?

A. Yes. It was well balzed and a painted red and yellow line there.

Q. There was a blazed line there?

A. Yes.

Q. Are you talking about a line established on the ground and the fence was measured from that line?

A. Yes.

Q. You have taken the old government survey and come up with your own plan for adjusted acreage because you say there is an overage?

A. It is not my plan, Mr. Barnes. It is the method of surveying taught by all schools in the country.

Q. Does that have any bearing on occupation lines? The occupation line is what throws the whole thing out of kilter, isn't it?

A. Yes sir.

Q. That is not the case here, is it?

A. I haven't tried to change anything, Mr. Barnes."

On redirect examination Mr. Turner said he did not know who placed the iron pin at the corners. Whereupon the appellant Smith was called to the witness stand and testified that Mr. F. M. Methvin placed the iron pins at each corner of his tract when his survey was made in 1965.

On cross-examination Mr. Smith said that Mr. Methvin placed the iron pins 61 feet north of where the old fence was. Mr. Turner was then recalled and testified as follows:

"Q. I hand you survey plat prepared by F. M. Methvin, which is dated 1965. Would you comment on the survey, how it was prepared and how he located the iron pin between the Smith property and the Goodson property?

A. He surveyed a standard 40 acre tract of land which

stated this was a large Section. He has staked out practically a standard 40 acre tract without any regard to the original government survey.

Q. This was a survey of the Smith tract, is that correct?

A. That is true.

Q. It had no reference to the Goodson tract?

A. No, sir."

On cross-examination Mr. Turner testified as follows:

"Q. All that shows is that Mr. Goodson [sic] has what he claims, isn't that true? It shows he has 1320 feet north and south, east and west from an iron pin Mr. Methvin put there, isn't that right?

A. Yes.

Q. That is the northwest corner of the Goodson property?

A. I would say that is not the way the survey should have been made. That is why I referred to the plat book.

Q. * * * I want to know if that is the Northwest Corner of the Goodson property?

A. Yes."

Mr. Turner said the government survey showed an overage of 127.38 feet in the north half of Section 26, and that his own survey showed an overage of 135.22 feet. He said he apportioned the difference in his survey with existing corners marked by iron pins and a witness tree. He testified as to the distance from the old fence erected by Goodson to the painted and blazed line apparently indicated on the government survey plat and/or established by Methvin. He indicated that Methvin used the wrong procedure in making his survey and made it without reference to the government survey, but Mr.

Turner does not say what dimensions his own survey gave to the Smith tract or the Goodson tract in the north half of Section 26.

Apparently Smith and Goodson are both thoroughly familiar with the location of the old fence-line and the so-called Methvin line. Their entire differences resulting in this litigation are over the area between the old fence and the Methvin survey line. While Mr. Turner testified as to the distances at both ends and in the middle between the old fence and the Methvin line, he never did say, and he was never asked, where he found or located the true boundary line in relation to the old fence and the Methvin survey line.

The chancellor found in effect that the division line as found or established by the Turner and Methvin surveys coincided with each other and were also identical with the quarter section line as indicated on the government survey plat. Turner's survey plat is somewhat misleading when considered without his testimony. His survey plat shows the west side of Goodson's north 40, more or less, in the north half of Section 26 to be 1,482.6 feet, and the west line of Smith's tract in the north half of Section 26 to be 1,320 feet. He shows no offsets in the section or quartersection lines, but shows the west boundary line of the north half of Section 26 to be 2,-802.6 feet, which is the same as shown for the quartersection line marking the west boundary of the Smith and Goodson properties. Turner said he apportioned the overage of 127.38 or 135.22 feet, but he did not say how he apportioned it, whether north and south or east and west.

We are ill-equipped on trial de novo to resolve the differences we have noted. We conclude, therefore, that this case should be remanded to the trial court for such further proceedings as may be necessary in clarifying the record and marking the exact location of the division line between the Smith and Goodson properties as found prorated and established by the Turner survey.

This cause is remanded to the Ouachita County Chancery Court for further proceedings not inconsistent with this opinion.

Cause remanded.